Matienzo, Demandante y Apelante, *v.* González et al.,
Demandadas y Apeladas.

Apelación procedente de la Corte de Distrito de San Juan,
Sección 1ª., en pleito sobre reivindicación de inmueble y
devolución de bienes.

No. 1682.—Resuelto en junio 27, 1918.

Escritura—Interpretación Dada por las Partes a un Poder.—La interpretación
dada por las partes a un poder por su propia conducta durante muchos años,
releva a la corte de un estudio minucioso de los términos en que está con-
cebido.

Transacción—Reclamación Dudosa—Convenio no Abierto a Impugnación
Colateral.—Cualquier reclamación dudosa basta para sostener un contrato
de transacción. Si la transacción de las partes ha de depender de la cues-
tión de si las partes han transigido las disputas tal cual la ley lo hubiera
hecho, entonces puede verdaderamente decirse que una transacción es un
acto inútil y que a nadie aprovecha, cuando pone en tela de juicio aún la
capacidad de las partes para verificar tal transacción. Aunque por razón
de la conclusión a que ha llegado esta corte en el presente caso no es nece-
sario resolver ahora la cuestión, parecería que se sigue la conclusión de que

aquí, al igual que en Louisiana, y aparte de los principios generales relativos a todos los contratos, un convenio semejante no está abierto a impugnación colateral.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. Damián Monserrat, Jr.*

Abogado de las apeladas: *Sr. Pedro González García.*

El Juez Asociado Sr. Hutchison, emitió la opinión del tribunal.

El día 2 de junio de 1900, don Julián Matienzo y Ahedo y doña Josefa González y Jiménez, el primero como esposo supérstite y la segunda como madre y heredera de Juana Cebrián, fallecida, otorgaron una escritura pública contentiva de las siguientes cláusulas:

"*Quinto.*—Que por tales motivos acepta la compareciente, heredera de doña Juana, como una verdad que atendido al estado de don Julián Matienzo, su situación actual, debe asegurarse que no sólo han existido o habido gananciales durante el matrimonio, sino que ha habido pérdidas, debidas esas pérdidas no sólo a los cuantiosos gastos que en los últimos años se vieron precisados a verificar para atender a la salud de ambos esposos que dejó y ha traído como consecuencia el fallecimiento de doña Juana Cebrián, sino también a los sucesos políticos y último huracán, cuyos acontecimientos han producido grandísima paralización comercial en todos sentidos.

"*Sexto.*—Que si bien aparecen algunas fincas adquiridas constante matrimonio sucede que en esas compras se invirtieron cantidades que se hicieron efectivas disponiendo de bienes aportados por don Julián Matienzo y representa por ello, parte de su capital aportado, aunque bajo otra forma.

"*Séptimo.*—Que para mayor claridad de las cosas y mayor conocimiento de causa, de todo han formalizado un inventario jurado, incluyendo todo el haber de don Julián Matienzo en la actualidad compuesto de toda clase de bienes, así como también su caudal cuando contrajo matrimonio y aportado a éste resultando que el primero alcanzó a la cifra de $115,292 pesos provinciales, y el segundo a la cantidad de $122,835.17 de la misma moneda, y por tanto que existen pérdidas de alguna consideración y que no han quedado gananciales que dividir, como pertenecientes a la sociedad de gananciales derivadas del matrimonio.

"*Octavo.*—Que doña Juana Cebrián no aportó cosa alguna ni

cuando se verificó el matrimonio, ni después de contraído, correspondiendo, por tanto, a don Julián Matienzo todo lo quedado y existente, debiendo recibirlo y tenerlo como su aportación unos bienes y otros en parte de pago de la misma aportación al matrimonio.

"*Noveno.*—Que en el registro de la propiedad aparece inscrita la propiedad a favor de don Julián Matienzo sobre los bienes siguientes, adquiridos antes del matrimonio; (se describen).

"*Duodécimo.*—Que bajo los antecedentes expuestos que ambas partes aceptan por conocerlos todos y ser rigurosamente exactos, los señores comparecientes de su libre y espontánea voluntad.

"OTORGAN:

"*Primero.*—Que habiéndose formalizado como queda dicho y privadamente, por ser los comparecientes mayores de edad, un inventario de todos los bienes existentes al fallecimiento de doña Juana Cebrián y González, a quien se refieren los precedentes de esta escritura, resulta evidente que, deducido el caudal que don Julián Matienzo aportó al matrimonio, no existen gananciales de ningún género y sí pérdidas de alguna consideración.

"*Segundo.*—Que no habiendo aportado al matrimonio cosa alguna doña Juana Cebrián y no existiendo gananciales, resulta evidente que no hay nada que heredar por la madre de ella compareciente, declarada heredera abintestato.

"*Tercero.*—Que en su consecuencia doña Josefa González y Jiménez en su carácter de heredera universal de su hija doña Juana Cebrián ratifica la aprobación prestada al referido inventario privado que tiene como la expresión fiel de la realidad de las cosas, por las razones que tiene expuestas y por tanto, que son completamente inútiles por carecer de razón para ello toda liquidación, ya que no existe otra aportación que la de don Julián Matienzo y toda su adjudicación, ni otra cosa que no sea el reconocimiento explícito de que cuanto ha quedado, corresponde exclusivamente al compareciente viudo don Julián Matienzo.

"*Cuarto.*—Que por la misma razón y derivación lógica de lo expuesto en las cláusulas anteriores, reconoce y declara doña Josefa González y Jiménez que todos los bienes quedados al fallecimiento de su hija, sean de la clase que fueren corresponden en pleno dominio a don Julián Matienzo, el cual los recibe los unos por pertenecerle desde antes de contraer matrimonio y los otros por ser adquiridos constante matrimonio, pero con caudal exclusivamente suyo y esto sin tramitación alguna y sin que se reserve doña Josefa Gon-

zález y Jiménez derecho ni acción alguna que reconoce desde ahora no tener.

"*Quinto.*—En virtud del reconocimiento consignado, queda autorizado don Julián Matienzo para que adicione los asientos del registro de la propiedad con los que sean necesarios o convenientes para expresar su dominio exclusivo sobre todos los bienes sean de la clase que fueren, ya adquiridos antes de contraer matrimonio ya adquirido después de contraído sin limitación ni reserva alguna.

"*Sexto.*—Por el mismo fundamento podrá también inscribir a su nombre y su exclusivo dominio cuando lo estime conveniente todos los bienes de la clase indicada y cuya inscripción no hubiere hecho con anterioridad."

Se ha transcrito en los autos un documento privado .que se firmó con posterioridad a la muerte de Julián Matienzo, que reza como sigue:

"En San Juan de Puerto Rico a 27 de diciembre de 1904.—De una parte doña Josefa González y Jiménez, mayor de edad, vecina de Santurce, viuda de Cébrián.—De otra: don Joaquín Matienzo y Amavizcar, comerciante, mayor de edad, vecino de San Juan, por sí y en nombre de su hermana doña Rosario, herederos ambos de don Julián Matienzo y Ahedo prestando por ella caución de *Grato et rato,* y en su defecto bajo exclusiva responsabilidad personal. Exponen: 1. Doña Josefa González, viuda de Cebrián: que suscribió una escritura con su hijo político don Julián Matienzo Ahedo .en 2 de junio de 1900 ante el notario don Tomás Valldejuli de Bayamón, poco después del fallecimiento de su hija doña Juana Cebrián y González, casada con el expresado Matienzo, reconociendo, por los motivos que en ella se expresan, y en su carácter de heredera de su expresada hija, que no existían gananciales, siendo por tanto de la propiedad del don Julián Matienzo todos los existentes que habían sido inventariados y tasados de conformidad con la exponente en 20 de mayo de 1900; pero que después del fallecimiento de este último ha tenido ocasión de convencerse, por el examen y estudio que ha hecho de los antecedentes auxiliada por su abogado don Rafael López Landrón y su hijo político don Juan O'Neil, de que no hubo exactitud en las operaciones practicadas de inventario y avalúo; y hecha una rectificación general de esas operaciones considera que la verdadera liquidación del capital de don Julián Matienzo al fallecimiento de su hija doña Juana debió de dar un resultado de gananciales a favor de la exponente su heredera, de $30,000

aproximación de sus derechos.   2. Don Joaquín Matienzo: que a su juicio la expresada escritura de 2 de julio de 1900 y el inventario avalúo que precedieron a la misma suscrito por doña Josefa fueron expresión de la verdadera situación del verdadero capital de don Julián Matienzo, comprobándose que no había gananciales; en lo que convino por su propia convicción doña Josefa, la que después ha venido aceptando una pensión de $40 mensuales, domicilio gratuito y otros beneficios otorgados por don Julián por su situación desvalida.—Sin perjuicio de estas manifestaciones deseosas ambas partes de evitarse los perjuicios y gastos de un litigio y especialmente don Joaquín Matienzo las apreciaciones contrarias a su crédito mercantil a que pudiera dar lugar ese litigio, han convenido la definitiva transacción de la cuestión de liquidación y pago de gananciales al fallecimiento de doña Juana Cebrián bajo las siguientes cláusulas.

"Por la cláusula primera se enumeran y describen los bienes que ha de recibir doña Josefa en pago de dicha transacción, que importa la suma de $22,272.

"La cláusula segunda dice: La escritura en que se consigna esta transacción que había de llenar todos los requisitos legales y especialmente los de la Ley Hipotecaria para inscripción de los inmuebles en el registro, se efectuará tan pronto como don Joaquín Matienzo reciba poder de la otra heredera y pueda practicarse e inscribirse la partición de los bienes, lo cual, salvo incidente o imprevistos, podrá tener lugar dentro de dos meses.

"La cláusula tercera dice así: Sin embargo, los efectos de este contrato comenzarán desde el primero de enero próximo, desde cuya fecha doña Josefa recibirá la cantidad de $1,000.—Las cédulas del Banco Territorial y Agrícola de Puerto Rico y las alhajas bajo recibo ante notario y se le transmitirán las acciones desde luego si se admitiese por los bancos la facultad de don Joaquín como albacea para efectuar las transferencias, o en su defecto cuando esté hecha la divisoria.

"La cláusula quinta dice así: La venta de la casa No. 37 de la calle de San Francisco, se hará bajo la condición resolutoria inscribible en el registro de que se rescindirá y quedará sin valor ni efecto si doña Josefa por sí, por cesionario o representada de cualquier otro modo estableciere acciones de nulidad o rescisión contra la escritura de 2 de junio de 1900 o contra este contrato de transacción, o pidiese a la sucesión de don Julián Matienzo, como heredera de doña Juana alguna cosa que no fuere el cumplimiento de esta misma transacción.   La condición resolutoria indicada subsistirá después del falle-

cimiento de doña Josefa hasta que sus herederos legítimos o testamentarios acepten y confirmen por documento notarial la presente transacción, en cuyo momento se cancelará en el registro de la propiedad dicha condición resolutoria.

"La cláusula sexta dice así: Declara doña Josefa que la presente transacción la hace aconsejada por el Lcdo. Rafael López Landrón y por su hijo político don Juan O'Neill quienes después de examinados los antecedentes que han creído conveniente la han estimado justa y equitativa.

"Declara don Joaquín Matienzo a su vez que se ha consultado con el Lcdo. don Francisco de Paula Acuña quien le ha aconsejado que la acepte, y los tres suscribieron este documento y la escritura posterior de conformidad. Doña Josefa declara, por último, que queda a su cargo costear el panteón en recuerdo de su hija doña Juana.

"La cláusula séptima dice así: De este documento privado se extenderán y firmarán dos copias, una para cada parte, y quedará sustituído por la escritura pública en la que se desarrollarán los conceptos en que está formulada, cuanto fuere necesario para su claridad y fuerza obligatoria. Josefa González viuda de Cebrián.— Joaquín Matienzo.—Franco. de P. Acuña.—Rafael López Landrón.— Juan O'Neill."

Esto fué seguido de una escritura de transacción y venta de fecha 21 de febrero de 1905, y que se relaciona en la exposición del caso como sigue:

"Comparecencia: De una parte doña Josefa González Vda. de Cebrián y de la otra don Joaquín Matienzo y Amavizcar.

"Concurre el segundo Sr. Matienzo por su propio derecho y además en concepto de apoderado de su hermana doña Rosario Matienzo y Amavizcar le otorgaran con fecha seis de diciembre último, que copiado a la letra dice así:

"El poder que aparece copiado en dicha escritura dice así:

" 'Y doña Rosario Matienzo y Amavizcar otorga: que da y confiere poder, tan amplio, general y bastante como su derecho se requiera para valer a don Joaquín Matienzo y Amavizcar; *Primera.* Para que privada o judicialmente reclame la entrega y tome posesión de los bienes, derechos y acciones que corresponden o pueden corresponder a la otorgante a título de heredera, legataria, causa y derecho habiente de su finado tío don Julián Matienzo y Ahedo, y dichos bienes, derechos y acciones, los administre, rija y gobierne, recaude y

cobre sus rentas y productos, arriende los inmuebles por término mayor o menor de seis años, desahucie o despoje a los que los detentaren y celebre toda clase de contratos, actos y gestiones de una libre y general administración.  *Segunda.* Para que represente a la otorgante en todas las operaciones testamentarias que se practiquen por defunción de su citado tío don Julián Matienzo y Ahedo, sobre inventarios, tasaciones o avalúos, partición o adjudicación de bienes, nombre peritos, tasadores, apruebe o impugne las referidas operaciones, otorgue y firme los documentos y escrituras públicas que conduzcan a la liquidación del caudal hereditario y tomando posesión. de los inmuebles se inscriban en el registro de la propiedad. *Cuarta.* Para que venda o enajene los bienes muebles e inmuebles, constituya hipoteca, etc., etc., ceda y trance y transija en todos cuantos derechos tenga o correspondan a la otorgante.' (Poder otorgado en Bilbao, España, con fecha 6 de diciembre de 1904 ante el notario Francisco Hurtado y Saracho).

"MANIFIESTAN: *Primero.* Que en 27 de diciembre de 1904, otorgaron privadamente un documento de transacción y venta de bienes y entrega de valores, cuyo texto dice así: (Se copia el documento antes relacionado, marcado letra A del demandante).

"Cláusula primera del otorgamiento:

" 'Que dando cumplido efecto al contrato de transacción antes transcrito vende y transfiere a favor de la otra compareciente Sra. doña Josefa González Vda. de Cebrián la propiedad y pleno dominio de las fincas que a continuación se expresan.  *Tercero.* Esta transacción tiene lugar por el precio ajustado y convenido de $22,272 que la Sra Josefa González Vda. de Cebrián confiesa tener recibida de manos del otro compareciente don Joaquín Matienzo Amavizcar con anterioridad a este acto en la forma siguiente: $509 a que ascienden el valor de las acciones, las cédulas de los Bancos de Puerto Rico y Territorial y Agrícola; $961 a que ascienden el valor de las alhajas relacionadas; $1,000 que en efectivo le fueron entregados y el resto de $19,802 que es el precio de los bienes transmitidos en esta escritura.' "

Cosa de diez años más tarde Rosario Matienzo que vive en España y que jamás ha residido en Puerto Rico inició un pleito para recobrar la propiedad así vendida a Josefa González alegando falta de causa o consideración y de capacidad por parte de Joaquín Matienzo y como segunda causa de acción "que la enajenación de los bienes relacionados la rea-

lizó Joaquín Matienzo, indebidamente y sin causa o razón justificada. No sirvió para extinguir obligación preexistente y válida; no se obtuvo con ella la cancelación de ningún derecho ni se pagaron deudas legítimas en favor de la demandada ni de ninguna otra persona. Llevó a cabo el acto por error y, antes que a la seriedad y méritos de los pretendidos derechos de la demandada, atendió a las apreciaciones contrarias que pudieran hacerse a su crédito mercantil de llevarse a los tribunales la ·cuestión propuesta.''

Josefa González, después de negar estos hechos, negativas que ·acompaña de alegaciones positivas, alegó como defensa adicional que:

''*Primera.*—La demandante carece de causa de acción para reivindicar los bienes objeto de la demanda, porque la demandada los posee de buena fe y en virtud de un título justo, legal perfecto e inscrito en el registro de la propiedad, del cual no se ha pedido previamente la nulidad, requisito indispensable para intentar con éxito la reivindicación.

''*Segunda.*—Las peticiones todas de la demanda implican virtualmente la resolución o la nulidad del contrato de 21 de febrero de 1905; y toda acción encaminada a tal fin se halla prescrita de acuerdo con la legislación vigente en Puerto Rico.''

El testimonio de Josefa González tal cual aparece del *record* es como sigue:

''Que después del fallecimiento de su hija nunca trató con don Julián Matienzo, su yerno, la cuestión de intereses, porque ella lo creía un hombre bueno y honrado y siempre le decía a su esposa, la hija de la demandada, que no tuviera cuidado, que la declarante no quedaría abandonada, que todo lo de él sería para ella; que él no sería malo con la declarante. Que a los pocos días de la muerte de su hija la que habla, veía de arriba para abajo los libros y se los llevaban para el mirador y escribían. Que después don Julián le dijo: 'tiene que firmar aquí,' y que como en aquellos momentos ella no se ocupaba de intereses ni de nada de ella lo firmó todo, por creer en conciencia que su yerno era bueno y honrado, entregándole las prendas y todo; que cuando don Julián marchó para España le dijo que las prendas eran de la declarante, por ser regalo que él le había hecho a la hija de la declarante y que no se las daba porque

en Santurce se las podían robar.   Que vivió seis meses, en compañía
de su yerno, hasta que se marchó a Santurce, entregándole las pren-
das y algunas monedas de oro para que se las guardara, recordando
que había un collar que valía mil pesos y después los que le entre-
garon a ella valían $300.

"Que en los seis meses que vivió con su yerno nunca le habló
de intereses, que Matienzo le hizo firmar algunos documentos; que se
dió cuenta del documento firmado ante Valldejuli después de firmarlo
y cuando había vuelto en sí.   Que su yerno le dijo: 'Usted queda
con una pensión y esa casa en usufructo,' respondiéndole ella que no
podía ser eso porque cuando él se casó con la hija de la declarante
sabía lo que tenía, que era muy poca cosa, que Trujillo lo compró
después y que el mismo don Julián le dijo a su esposa delante de la
declarante 'Trujillo es para tí,' y ella tampoco le habló de intereses;
que cuando su hija estaba agonizando le dijo a Matienzo: 'Trujillo
es para mí, tú me los has dado de palabra, déjalo para mi madre,
no la abandones'; que su hija murió en 1900.

"Añade, que cuando se firmó el inventario no estuvo presente, y
que si lo firmó fué porque Matienzo mismo le presentó el documento
a presencia del sobrino de la declarante, don Alberto González.   Que
firmó todo lo que le trajeron.   Que no vió al notario Sr. Valldejuli.
Que no vió nada ni sabe nada.   Que le dijeron 'firme aquí y aquí'
y que firmó sin saber lo que firmaba creyendo en la honradez de su
yerno.   Y agrega: 'Muriéndose mi hija llamó a Matienzo y le dijo:
'Sólo te encargo que no abandones a mi madre.'   A lo que él res-
pondió: 'Tu sabes que yo siempre la he atendido y la he querido
como a una madre.'   Lo demás de la declaración de esta testigo se
refiere a que intervino en el inventario a nombre de ella su sobrino
Alberto G. González; a que tiene una carta de este señor en la que
le dice que no sabe nada de lo ocurrido y que ella se dirigió a dicho
señor González haciéndole cargos porque no le advirtiera el que no
debía firmar los documentos antes aludidos y que nunca le dió facul-
tades a su sobrino para que llevara su representación."

### Joaquín Matienzo declaró en parte como sigue:

"Que él es un hombre honrado y obró en conciencia y obraron
tres que eran los albaceas, uno de ellos una persona de mucho valer,
el banquero de Madrid, señor Llagudo.   En cuatro de noviembre de
mil novecientos cuatro murió don Julián Matienzo, recibió un cable
del señor Llagudo, banquero de Madrid y al correo siguiente una
copia del testamento y vió a quien legaba los bienes.   Entre ellos

dejó unas cuantas mandas en España, un usufructo allá en Madrid y los bienes que dejó a la viuda doña Josefa González fueron en usufructo en dos casas en Santurce, parada 23. Entonces enseñó el testamento a la demandada y ella naturalmente se sorprendió y parece que no estuvo conforme, y entonces el testigo le dijo: Señora no se apure usted que yo le seguiré dando todos los meses lo que don Julián acostumbraba darle a usted, en vista de que usted queda en una situación angustiosa, anciana ya, y yo siempre procuraré ayudarla y ella le dijo al testigo que ella tenía otros derechos y el testigo trató de aconsejarle para que dejara eso así, que viera el testamento, que el testigo no había hecho nada en contra de ella, que ella no estuvo conforme pero que siempre trataría de darle la mensualidad que le daba don Julián de la cuenta particular del testigo; que en la carta que recibió del señor Llagudo éste le decía que deseaba le diera el asunto a don Francisco de Paula Acuña, abogado antiguo de don Julián Matienzo, amigo de aquél y nombre honorable, para que lo arreglara todo, porque tenía plena confianza en él, se dirigió al abogado Sr. Acuña y le entregó el asunto; y el Sr. Acuña le indicó que le llevara todas las escrituras, todo lo que él tenía y una relación exacta de los bienes de Julián Matienzo, y así lo hizo, presentándose entonces la demandada con el abogado don Rafael López Landrón y otros más, con quienes tuvo varias entrevistas y no pudiendo discutir con ellos, entregó el asunto al Sr. Acuña para que lo presentase a la corte. Que transcurrieron uno o dos meses en discusiones de los abogados y en eso el Sr. Acuña le aconsejó que transase el asunto, porque en los tribunales había ciertas cosas que era de opinión que antes de ir a los tribunales se debía transigir; que él indicó al señor Acuña que solamente era un albacea; pero que había otros dos que también lo eran, don Manuel Cañala y don Quirico Llagudo, personas respetables, con quienes debía antes consultar para ver su opinión, pues él, albacea y heredero, necesitaba el consejo de éstos; que puso un cable consultando el caso al señor Llagudo el que le contestó expresando su conformidad, que ya había tenido la primera transacción y que al hacerla provisionalmente no tenía poder para hacer la escritura ante notario; el señor expresó a la demandante que mandara inmediatamente el poder si no quería ver sus bienes en peligro; que el poder debía ser especial para hacer la división y la transacción 'que era ésta,' y mostraba un papel que decía había redactado el Sr. Acuña y que al mes y medio recibió dicho poder con una carta de su hermana para salvar la situación, carta que el declarante manifiesta tener en su poder, para hacer la divisoria y para hacer esa transac-

ción.   En este asunto tan obró en conciencia, que lo puede probar
con libros y documentos; que en los libros constan treinta mil dólares
y eran cuarenta y ocho mil y que él no podía decir lo contrario por
ser un hombre honrado; que él no podía decir al abogado Sr. López
Landrón que el balance era de $30,000 cuando en realidad había
$48,000; que le dió pena el que la demandada quedara en desamparo
y que sus sentimientos le obligaron a la transacción y pasó meses de
angustia discutiendo con todos los abogados y exclama: 'en manos
de López Landrón, quiero decirle a la corte, ¿qué haría yo?'

"Continúa este testigo su declaración y añade: El derecho de la
Sra. González nace de haberse hecho bajo tasación de los bienes que de-
jara don Julián; que doña Josefa González era suegra de don Julián
Matienzo; que la hija de la demandada estuvo casada con don Julián
que en el matrimonio Matienzo-Cebrián no hubo sucesión; que cuando
falleció don Julián dejó un capital respetable; que ese capital se dis-
tribuyó en muchas mandas y entre otros sobrinos del finado quedán-
dole al declarante solamente los cacharros y las embrollas.   Asegura
que puede juzgarse el estado de la fortuna de don Julián antes y
después de su matrimonio; que durante la comunidad conyugal ad-
quirieron bienes, entre otros, la finca de Trujillo que tiene y posee
el declarante, que lleva treinta y cinco años en Puerto Rico, donde
llegó de nueve.   Que vino directamente donde su tío, con quien estuvo
hasta que éste se marchó enfermo y quedó entonces como su apo-
derado; que estuvo junto a él mientras permaneció soltero, y después
de casado aquél y por ello tenía conocimiento del estado de su fortuna,
en una y otra época, y de que hubo gananciales en su matrimonio.

"Y prosigue este testigo diciendo: Que la demandada hizo una
reclamación a la sucesión de don Julián Matienzo, sin que recuerde
si se llegaron a entablar procedimientos judiciales.   Que don Francisco
de Paula respondió por él para que no le embargasen los bienes,
respondiendo de la honradez del declarante y dijo al señor López
Landrón que él se hacía responsable de que el testigo recibiera el
poder y la autorización para llevar a efecto lo que había tratado; que
como careciera de poder el declarante dijo 'por lo que a mí responde
yo lo hago.'   Dice también que él no le pidió a su hermana el poder,
que quien lo pidió fué don Quirico Llagudo, él quería transiguir por
sí solo, pero don Rafael López Landrón quería que fueran los
dos.   Que él consultó con éste, quien le dijo a su hermana que inme-
diatamente mandara el poder al testigo en las condiciones necesarias
para efectuar la transacción, que el testigo se salvaría, pero ella no
perdería lo suyo.   Que don Francisco Acuña le dijo: 'mire Joaquín,

tiene que hacer esto porque va a pasar esto, esto, y usted tiene que hacerlo.' Añade también que le dió conocimiento a su hermana de la divisoria y de la transacción y que ella lo aprobó todo y que el poder vino para eso expresamente, porque no se podía hacer la divisoria mientras no estuviera cancelada la reclamación de la demandada. Dice, además, que su hermana, la demandante, ratificó la transacción por carta, y que en su poder obran como cincuenta de esas cartas.

"A preguntas del demandante dice: Que no trajo esas cartas al juicio, que las podía buscar, que estaban en poder del Ldo. Texidor. Dice que una minuta que presenta se refiere al contrato privado, y está con la letra de don Francisco de Paula Acuña. Que en 27 de diciembre de 1904, cuando se hizo la transacción, ya había venido el poder, pero faltaba en él la firma del marido de su hermana, y hubo de pedirse otro con esa formalidad, y entonces vino.

"A preguntas de la corte dice: Que al hacer la transacción lo hacía partiendo de la base de que había gananciales en el matrimonio de doña Juana Cebrián y don Julián Matienzo y que puede enseñar al señor juez el balance que se hizo a la muerte de doña Juana; que le consta la existencia de gananciales por los balances que tiene en su poder, en los cuales figuraba un capital de 30,000 pesos y eran realmente $48,000 y se hizo para formalizar una escritura demostrando que no había gananciales, que se dió a las propiedades un valor menor del precio en que fueron adquiridas y él no podía pelear con un abogado, mintiendo, porque le harían traer los libros y éstos hubieran dicho lo contrario; que sabía que el balance general de los bienes de don Julián era mayor que antes de casarse, porque tenía los balances en su poder.

"Al preguntarle el abogado de la demandante, que cómo explicaba el hecho consignado y aceptado en el documento privado, en el cual dice el propio testigo, que a su juicio la expresada escritura de mil novecientos y el inventario y avalúo que precedieron a la misma, suscrito por doña Josefa González, la demandada, fué expresión de la verdadera situación del capital de don Julián Matienzo, comprobándose que no habían gananciales en lo que convino la demandada, la que después vino aceptando una pensión y otros beneficios, contesta: 'que alguna forma debía de darle su abogado para defenderlo.' 'Creo que es la forma que empleó mi abogado para hacer ver a la otra parte que era una concesión especial. Y añade, que vió en el asunto un peligro de que se quedaran sin un centavo. Especifica bien, (pág. 15 del récord taquigráfico) que la casa de comercio debía $18,000 que él tenía que pagar; y que allí en la

escritura de transacción estaría también la garantía de la deman-
dada para no volver a reclamar nada a él ni a los herederos.  Que
hizo esa transacción por su cuenta y la de su hermana porque tenía
poder de ésta autorizándole, y los demás albaceas estaban deseosos
de que el asunto terminara.  Que él no creía que ningún hombre
fuera a regalar lo suyo.

"El abogado de la demandada preguntó al testigo si en el con-
contrato de transacción se estableció por la cláusula 5ª. que la venta
de la casa No. 27 de la calle de San Francisco debía hacerse bajo la
condición resolutoria inscribible en el registro de que sería rescin-
dida y dejada sin efecto si la demandada o sus herederos establecían
acción de nulidad o rescisión de la escritura de 2 de junio de 1900, o
contra dicho contrato de transacción, o pidiese, como heredera de su
hija, a la sucesión de Julián Matienzo alguna cosa que no fuese el
cumplimiento de la transacción, y que ésta condición se hizo constar
porque en otra ocasión anterior la demandada había aceptado la
inexistencia de gananciales en el matrimonio de su hija y para garan-
tizar esto se comprometía ella a no hacer reclamación alguna; siendo
esta cláusula la compensación de la venta de dicha casa, contestó que
sí; que le dijo al señor Acuña que le garantizase porque en aquel
tiempo había cierto movimiento justo o injusto y él no era hombre
de eso, se ponía nervioso y no le gustaba ir a la corte, y le rogaba
lo hiciese para tranquilidad suya y de su hermana, lo cual no consi-
guió del señor Landrón en un día ni en quince, sino después de
grandes discusiones.

"A preguntas del demandado el propio testigo se expresa así:
Don Julián Matienzo era un hombre especial de carácter bondadoso,
que la familia de su esposa tenía mucho que agradecerle porque las
protegía, como protegía a otras muchas familias pobres que vivían
en San Juan, y la demandada estaba también muy agradecida lo
que le constaba por haber vivido en compañía de ellos y conocer
las interioridades de la familia; que debido a este agradecimiento
la demandada no podía decir al señor Matienzo 'yo no firmo nada
de lo que Ud. me ponga' y esto cree que es verdad en conciencia y es
el sentimiento de verdad ante la cara de Dios; don Julián era un
hombre bondadoso, y él garantiza que no podía haber ninguno como
él, pero era un hombre muy precavido.

"Que sabía que en la escritura otorgada entre don Julián Ma-
tienzo y su suegra se declaraba que no había gananciales.  Que él
no asistió al acto de la escritura.  Insiste de nuevo en que hubo ganan-
ciales fundado en la valoración de las fincas y que le constaba que

había fincas adquiridas durante el matrimonio. Añade que el dinero con que se compró la finca de Trujillo fué con dinero, antes pero parte adquirido después del matrimonio. Que cuando murió don Julián su capital había aumentado y que en la ferretería existían $48.000 y se había puesto en $30,000 para parecer que no había gananciales; que otras fincas habían sido valoradas en bajos precios. Le fué presentada por el abogado de la demandada un documento, y reconoció que era la minuta para la transacción, hecha en días antes de octubre de 1904, y escrita por éste en presencia del testigo. Que al celebrar la transacción con doña Josefa González, tenía conocimiento de la escritura e inventario que habían firmado ella y don Julián Matienzo al mes, o dentro de los dos meses siguientes al fallecimiento de su esposa. Que conocía el texto de dichas escrituras y sabía que a pesar de ellas existían gananciales, lo cual le constaba al celebrar la transacción, puesto que las propiedades valían más de la cantidad en que figuraban, y habían sido adquiridas durante el matrimonio. Que cuando se casó Matienzo sólo tenían unos solares, unas casas y la ferretería.

"A preguntas del Honorable Juez añadió: Que cuando murió la señora de Matienzo había aumentado el capital; que los bienes estaban valorados en menos de lo que habían costado; que en la ferretería habían $48,000 y en el inventario figuraban $30,000. Que la finca de Trujillo Alto figuraba en $10,000 y había costado $28,000 y así los demás bienes; y ese inventario sirvió de base para hacer la escritura ante el notario Valldejuli."

No se presentaron más testigos, no se hizo objeción alguna contra ninguna parte de la declaración de estas dos personas, ni se realizó esfuerzo alguno para contradecirlas o desacreditarlas.

El juez sentenciador basado en dicha prueba desestimó la demanda por las razones mencionadas en sus conclusiones, que rezan como sigue:

"Porque el contrato privado de 27 de diciembre de 1904 a que se hace referencia en el hecho tercero de la demanda, fué ratificado en escritura pública de 21 de febrero de 1905 otorgada ante el notario don Eduardo Acuña Aybar, por don Joaquín Matienzo Amavizcar, como apoderado de su hermana la demandante, debidamente autorizado, habiendo sido inscrita en el registro de la propiedad las

diferentes transmisiones de inmuebles hechas por dicho instrumento en favor de la demandada;

"Porque la enajenación no se llevó a cabo gratuitamente, como afirma la parte actora, sino en virtud de una transacción llevada a cabo con suficiente causa y la cual después de la ratificación reúne todos los requisitos exigidos por la ley;

"Porque cuando el demandante y el demandado derivan sus títulos del mismo origen, y el derecho a reivindicar se funda en la nulidad de la transmisión del título al demandado, es necesario pedir antes la nulidad del título de éste, pues sólo anulándose puede recobrar sus fuerzas el título del demandante, toda vez que ambos títulos no pueden subsistir y armonizarse;

"Porque en todo caso la acción de nulidad del contrato de 21 de febrero de 1905 estaría prescrita de acuerdo con el artículo 1268 del Código Civil."

Cada una de las conclusiones arriba relacionadas sobre las que la corte inferior basó su sentencia ha sido apuntada como error.

El apelante, en cuanto a la primera proposición, insiste en que el poder no podía ser considerado con efectos retroactivos; que el convenio original que se contiene en el documento privado es el único contrato; que el último instrumento notarial fué simplemente una tentativa de "autenticarlo" para los fines de su inscripción; que no debemos mirar a la forma sino a la sustancia; siendo patente el hecho de que Matienzo actuó sin autoridad y sujeto a la aprobación de su hermana; que el poder para transiguir es un poder general y no el mandato expreso que exige el artículo 1615 del Código Civil; que en el poder no se sugiere la ratificación y debe interpretarse estrictamente; que el artículo 1259 del Código Civil es el que debe regir este caso; que aún cuando tuviese Matienzo poder para transigir carecía de facultades para la transmisión del título a la propiedad del demandante en pago de deudas, y que de cualquier modo no constituyen causa o consideración del contrato indefinidos e indeterminados derechos.

Si como alega y aún insiste el apelante, pero que dejó.

totalmente de probar, ella no tuvo conocimiento alguno de lo que se había hecho hasta dentro de algunos meses antes de radicarse el pleito, si no hubiese esperado diez años para tomar alguna acción en el asunto, si su apoderado no hubiera asumido actuar como lo hizo por virtud del poder, si sólo existiesen ante nosotros el documento privado y la escritura de poder, entonces la contención del apelante merecería indiscutiblemente seria consideración. Pero la declaración no contradicha de Joaquín Matienzo demuestra que toda la cuestión fué colocada de una vez en manos del abogado. que había representado a Julián Matienzo hasta la fecha de su fallecimiento, que esto se hizo a instancias del otro albacea y consultor del demandante en España, que la demandante tuvo completas noticias de la situación, que el poder fué otorgado con el único propósito de habilitar al testigo para transigir con Josefa González, que el poder lo había recibido en realidad de verdad antes de otorgado el documento privado pero sin la firma del esposo de la demandante y que tenía muchas cartas de su hermana con relación a estos asuntos, la cual correspondencia estaba en poder de un prominente letrado de San Juan, cuyo nombre fué dado.

Una curiosa circunstancia en la que aparentemente no se fijó ninguna de las partes, es la de que el poder está en realidad de verdad fechado en diciembre 6 de 1904, o sea cosa de tres semanas antes de otorgarse el documento privado, y la manifiesta confianza con que Joaquín Matienzo en el documento últimamente mencionado garantiza la actitud de su hermana respecto del asunto, del mismo modo presta mayor fuerza a su declaración. Pero es aún de mayor significación el hecho *revelante* de que por espacio de una década nada hizo la demandante.

En 21 de febrero de 1905 tenía Joaquín Matienzo plenos y expresos poderes de su hermana tanto para transigir las reclamaciones contra la sucesión de Julián Matienzo como para enajenar sus bienes. Con ese poder asumió ora rati-

ficar, ora dar cumplimiento al contrato privado ya convenido
por él por su hermana al igual que por sí mismo, ora para
sustituir, un contrato auténtico en el que se trataba e incluía
de todos modos la trasmisión del interés de su principal en
determinados bienes reales y personales. Al hacerlo así tam-
bién traspasó su propio interés en esos bienes y actuó en
virtud del consejo que le diera un abogado capacitado electo
por un banquero en España, que era también uno de los al-
baceas con quien la hermana estaba en íntimo contacto; y
si el testimonio arriba relacionado es cierto es algo difícil
evitar la conclusión de que la transacción a que así se llegó
fué un resultado casi tan satisfactorio como razonablemente
esperarse pudiera. Pero sea de ello lo que fuere, la hermana
con pleno conocimiento de lo actuado por su hermano con su
conducta demostró su aquiescencia con él mismo y adoptó lo
actuado por su hermano por su propia acción. Para ella es
ya muy tarde para que pueda levantar cuestiones técnicas
respecto a si fué o no la escritura de 21 de febrero de 1905
en un sentido estrictamente legal una ratificación o respecto
a si podía o no interpretarse el poder de modo que apareciese
una autorización para semejante ratificación, o respecto a si
eran o no los términos en que el mismo estaba concebido sufi-
cientemente específicos para sostener la transacción de la re-
clamación particular de que se trata o para autorizar la ena-
jenación de la misma propiedad de hecho ya transferida en
transacción.

Con el fin de sostener el alegado carácter gratuito de la
enajenación, el apelante trata de evitar el efecto del convenio
o contrato de transacción y venta, basándose en la teoría de
la no ratificación; prácticamente descarta toda la prueba des-
pués de una tentativa para demostrar que no merece seria
consideración, y descansa sobre el instrumento de 2 de junio
de 1900, sobre el inventario que le precedió y que constituye
la base del mismo, sobre el testamento y sobre la falta de la
demandada Josefa González, de establecer la existencia real

de los bienes gananciales. No es preciso que repitamos la prueba que se deja citada respecto de las circunstancias que rodean el otorgamiento de la escritura notarial de 1900, corroborada como está por los hechos de 1904 y 1905; y la interpretación que le han dado al poder las partes por su propia conducta nos releva de un estudio minucioso de los términos en que está concebido.

Cualquier reclamación dudosa basta para sostener un contrato. 5 R. C. L. 880, 881; secciones 5 y 6; 12 C. J. 322, 324; 13 C. J. 349; 12 Manresa 97. ''Si la transacción de las partes se hace depender de la cuestión de si las partes han transigido las disputas tal cual la ley lo hubiera hecho, entonces puede verdaderamente decirse que una transacción es un acto inútil y que a nadie aprovecha, cuando pone en tela de juicio, aun la capacidad de las partes para aplicarse.'' 6 R. C. L. 663, sección 75.

La argumentación del tercero y cuarto motivos de error asume la falta, tanto de consentimiento, como de causa, pero esto, como lo hemos demostrado, constituye una falsa premisa. El contrato era solamente anulable, no absolutamente nulo, y, por los términos del artículo 1717 del Código Civil era *res judicata* entre las partes. Parecería, aunque por razón de la conclusión a que hemos llegado no es necesario resolverlo ahora, que se sigue la conclusión de que aquí, al igual que en Louisiana, y aparte de los principios generales relativos a todos los contratos, un convenio semejante no está abierto a impugnación colateral. Véase 12 Manresa 122, 123, *Oglesby* v. *Attril,* 105 U. S. 605.

No encontramos error alguno que produzca la revocación de la sentencia recurrida, la que es de confirmarse.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Asociados Wolf y del Toro.

Los Jueces Sres. Presidente Hernández y Asociado Aldrey no intervinieron.