WATERMAN EXPORT CORPORATION, demandante, recurrida y recurrente, *v.* ENRIQUE VALDEJULLI, demandado, recurrente y recurrido.

*Número:* 12907    *Resuelto:* 3 de junio de 1963

---

*Hartzell, Fernández & Novas* y *Vicente M. Ydrach,* abogados de la recurrida y recurrente; *Guillermo S. Pierluissi,* abogado del recurrente y recurrido.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Se trata de una acción en cobro de dinero en la cual la demandante interesa se condene al demandado a pagarle el importe de cierta mercancía vendídale y no pagada y al pago de intereses sobre las partidas adeudadas.

El Tribunal Superior declaró con lugar la demanda y sentenció al demandado a pagar la suma principal de la deuda y $500.00 de honorarios de abogado, más las costas, pero no hizo pronunciamiento alguno sobre los intereses. Recurren ante nos ambas partes; la demandante solicitando el interés legal sobre las mencionadas partidas y la suma de $26.98 que pagó al Banco de Ponce por sus gestiones de cobro, y el demandado solicitando la revocación de la sentencia. El demandado señala como errores (1) el haber concluido el tribunal de instancia que Raúl Valdejulli era mandatario del demandado Enrique Valdejulli y (2) el haber sido condenado al pago de la suma reclamada.

De las claras conclusiones de hecho del tribunal sentenciador extractamos las que siguen, unas en forma abreviada y otras citadas directamente. La demandante es una firma exportadora de Nueva York. Desde 1947 tuvo relaciones comerciales con el demandado, un comerciante importador de San Juan. Mediante una serie de órdenes el demandado ordenó a Waterman una mercancía consistente en cajas de frutas y otras provisiones para la reventa en esta plaza.

"Las cartas ordenando el embarque de dicha mercancía aparecen todas firmadas por Raúl Valdejulli, hijo del demandado Enrique Valdejulli y quien trabajaba con su padre. Dichas cartas están todas escritas en papel timbrado del demandado cuyo timbre lee como sigue:

E. Valdejulli—Comisionista P.O. Box 1854, San Juan, P.R. Cable Address "Valdejulli"—Carnes, Frutas y Vegetables— Huevos—Queso—Tel. 2-1181."

Como resultado de esa correspondencia el demandante vendió y envió al demandado cinco embarques de frutas y provisiones, cuyo importe total suma $2,609.03. Los detalles relativos a descripción de las provisiones enviadas, vapor utilizado, número de los conocimientos de embarque e importe de cada factura aparecen en la conclusión de hecho número 7 del Tribunal Superior y no creemos necesario reproducirlos aquí.

"Al llegar dicha mercancía a San Juan la misma fue levantada de los muelles por diversos carreros y por Raúl Valdejulli, y todos ellos al levantar dicha mercancía firmaron los correspondientes 'cart checks' a nombre del demandado Enrique Valdejulli, según aparece de los 'cart checks' que están en evidencia y que aparecen marcados como Exhibit 9 de la Parte demandante."

"En todas las gestiones sobre entrega de embarque, reclamaciones y liquidaciones de embarque que efectuaba Bull Insular Line, Inc. con el demandado Enrique Valdejulli, era el hijo de este último, Raúl Valdejulli la persona que intervenía a nombre de su padre el aquí demandado. Antes del 1948 el demandado se ocupaba personalmente de esas gestiones, pero a partir de esa fecha encomendaba las mismas a su hijo Raúl Valdejulli. Este

último iba personalmente a la oficina del Sr. Vicente González Grau, a cargo de reclamaciones de Bull Insular Line, Inc. y seguía todo el trámite de las diversas reclamaciones que interponía a nombre de su padre Enrique Valdejulli y recibía los diversos cheques que en pago de dichas reclamaciones extendía al demandado la Bull Insular Line, Inc. En ningún momento durante todas las épocas a que se refiere la demanda en este caso, recibió la Bull ni el Sr. Vicente González Grau instrucciones del demandado a los efectos de que no se entregara a Raúl Valdejulli mercancía que venía consignada al demandado." . . .

"Durante aquellas épocas en que el demandado se ausentaba de Puerto Rico, su negocio en San Juan era dirigido por su hijo Raúl Valdejulli desde la oficina del demandado en San Juan."

Durante la época a que se contraen los hechos que dieron margen a este pleito la Bull Insular Line, Inc., extendió cheques a la orden de Enrique Valdejulli por reclamaciones formuladas por éste. Dichos cheques fueron entregados a Raúl Valdejulli y al dorso de los mismos aparece un endoso, que es similar en cada cheque, que dice lo siguiente: "Deposit to the account of E. Valdejulli Rodríguez".

"Durante todas las fechas a que se refiere la demanda Raúl Valdejulli tenía un poder de su padre, el demandado Enrique Valdejulli, fechado 27 de octubre de 1949 el cual le autorizaba a administrar todos los negocios y asuntos de Enrique Valdejulli durante la ausencia de éste. (Véase Exhibit 10 Dte.). La parte demandada no ha probado en ninguna forma que hubiera notificado en ningún tiempo dentro de las épocas a que se refiere la demanda a Waterman Export Corporation ni a Bull Insular Line, Inc. de que hubiera revocado dicho poder. Tampoco se ha probado al Tribunal que dicho poder hubiera sido revocado en ningún momento."

"Durante todas las fechas a que se refiere la demanda la firma de Raúl Valdejulli era una de las firmas acreditadas para girar contra la cuenta que el demandante Enrique Valdejulli tenía en el Banco de Ponce en San Juan, Puerto Rico."

"La mercancía embarcada por la demandante al demandado y a la cual se hace referencia en la demanda no ha sido pagada por el demandado ni por persona alguna a la parte demandante a pesar de haber sido el demandado requerido a ello. Los diversos

giros enviados por la parte demandante al demandado a través del Banco de Ponce no fueron honrados y dicho banco por las gestiones de cobro realizadas cobró a Waterman Export Corporation la cantidad de $26.98. (Véase Exhibit 5 Dte.)"

El tribunal sentenciador hizo otras conclusiones de hecho relativas a una renuncia, posterior a la época que nos interesa, que del cargo de Administrador de los negocios de su padre hizo Raúl Valdejulli, relativas a conversaciones entre Enrique Valdejulli y el Presidente de Waterman Export, y relativas a otros extremos que no se reproducen por no ser pertinentes.

El tribunal sentenciador concluyó que Raúl Valdejulli era mandatario de su padre, el Sr. Enrique Valdejulli; encontró que la deuda no había sido pagada y dictó sentencia en los términos anteriormente relatados.

■ El primer error señalado por el demandado no se cometió. Es correcta la conclusión del tribunal de instancia en el sentido de que para la época aquí concernida Raúl Valdejulli era mandatario de su padre Enrique Valdejulli. Tampoco erró el tribunal al condenar al demandado al pago de la deuda. El mandato puede ser expreso o tácito; la aceptación puede ser también expresa o tácita, deducida esta última de los actos del mandatario. Art. 1601 del Código Civil, 31 L.P.R.A. sec. 4422; *Loíza Sugar Co.* v. *Zequeira*, 63 D.P.R. 864, 872 (1944); *Dooley* v. *Pantoja*, 61 D.P.R. 642, 646 (1943); *Torres* v. *P.R. Racing Corporation*, 40 D.P.R. 441, 446 (1930); *Matienzo* v. *González*, 26 D.P.R. 457, 473 (1918).

Veamos ahora la posición del demandante. En su demanda éste reclama intereses desde las fechas en que los cinco embarques de mercancías le fueron entregados al demandado en San Juan, P.R. Examinemos el derecho que cubre esta situación.

■ La transacción aquí envuelta es una compraventa mercantil. "Será mercantil la compraventa de cosas muebles para revenderlas, bien en la misma forma que se compraron, o bien en otra diferente, con ánimo de lucrarse en la reventa",

declara el Código de Comercio, en su Art. 243, 10 L.P.R.A. sec. 1701.

Siendo esto así, para determinar si el deudor incurrió en mora, y en caso afirmativo, desde cuándo, es necesario ver lo que sobre el particular dispone el Código de Comercio, pues los contratos mercantiles se rigen, en primer término, por dicho Código, Art. 81, 10 L.P.R.A. sec. 1301.

Las Disposiciones Generales del Código de Comercio, 10 L.P.R.A. secs. 1301–1314, contienen preceptos sobre el particular pero también hay disposiciones expresas sobre el asunto en el subcapítulo dedicado a la Compraventa Mercantil, 10 L.P.R.A. secs. 1701–1721. Desde luego, debemos atenernos a las disposiciones expresas del Código sobre la compraventa mercantil. Éstas, como señala Langle Rubio, son excepciones a las reglas generales contenidas en las Disposiciones Generales. [1]

Sobre cuando empieza la obligación del pago del precio en las ventas mercantiles, encontramos que el Código de Comercio, en su Art. 257, dispone que dicha obligación empieza cuando las mercancías vendidas se ponen a disposición del comprador y éste se da por satisfecho. Dice dicho artículo:

"Puestas las mercaderías vendidas a disposición del comprador, y dándose éste por satisfecho, o depositándose aquéllas judicialmente en el caso previsto en la sec. 1708 de este título, empezará para el comprador la obligación de pagar el precio al contado o en los plazos convenidos con el vendedor.

Este se constituirá depositario de los efectos vendidos, y quedará obligado a su custodia y conservación según las leyes del depósito." 10 L.P.R.A. sec. 1715.

■ No se nos confronta con que en estas transacciones del caso de autos se pactaran plazos. El citado Art. 257 del Código de Comercio concuerda perfectamente con el Art. 1053 del Código Civil, el cual dispone que en las obligaciones recí-

---

[1] Langle Rubio, *Manual de Derecho Mercantil Español*, Tomo III, pág. 12 (1959).

procas desde que uno de los obligados cumple su obligación, empieza la mora para el otro. También dispone dicho Art. 1053 que no será necesario la intimación del acreedor cuando la obligación o la ley así lo declaren expresamente, 31 L.P.R.A. sec. 3017. Regresando al Código de Comercio para ver si era necesario la intimación del acreedor encontramos que en su Art. 94, 10 L.P.R.A. sec. 1314, dicho Código dispone que en los contratos que tuvieren día señalado para su cumplimiento, por voluntad de las partes o *por la ley*, los efectos de la morosidad en el cumplimiento de la obligación mercantil comenzarán al día siguiente de su vencimiento. En los contratos que no lo tengan (el día señalado para su cumplimiento) los efectos de la morosidad comienzan desde el día en que el acreedor interpelare al deudor. En el caso de la compraventa mercantil, como hemos visto (Art. 257 del Código de Comercio), la obligación de pagar el precio, salvo pacto en contrario, empieza inmediatamente que las mercancías sean puestas a disposición del comprador y éste se dé por satisfecho.

Haciendo énfasis en esta característica de la contratación mercantil el Código de Comercio, en sus Disposiciones Generales, Art. 92, dispone que "No se reconocerán términos de gracia, cortesía u otros que bajo cualquiera denominación, difieran el cumplimiento de las obligaciones mercantiles, sino los que las partes hubieren prefijado en el contrato, o se apoyaren en una disposición terminante de derecho." 10 L.P.R.A. sec. 1312.

Comentando estos artículos escribe Langle Rubio: "La enérgica tutela jurídica del tráfico mercantil exige que las obligaciones comerciales ofrezcan la mayor seguridad en cuanto al tiempo en que deberán cumplirse. . . . Pero claro está que, si el acreedor quiere tolerar la tardanza del deudor, le es permitido hacerlo. Como el Tribunal Supremo ha explicado, la prohibición del Art. 61 es para que no se obligue a una de las partes contratantes a admitir esos términos de gracia o cortesía, pero no se opone a que si una de ellas quiere aceptar

o convalidar voluntariamente el retraso o demora de la otra, nada lo impide, en virtud del principio de autonomía de la voluntad y libertad de contratación (Sent. 24 marzo 1953)." (²)

▮▮ Puede verse que, en lo mercantil, cuando está fijada la fecha de cumplimiento de la obligación, ya sea por voluntad de las partes o por disposición de ley, huelga la "interpelattio". Cuando está señalada la fecha de cumplimiento el deudor incurre en mora al día siguiente de vencer la obligación por disponerlo así el Art. 94 del Código de Comercio, 10 L.P.R.A. sec. 1314, y dispone el Art. 259 del mismo Código, 10 L.P.R.A. sec. 1717, que: "La demora en el pago del precio de la cosa comprada constituirá al comprador en la obligación de pagar el interés legal de la cantidad que adeude al vendedor." Naturalmente, el interés puede ser otro que el legal, si así se ha pactado. Como se sabe, el interés legal es el 6 por ciento al año. Art. 1061 del Código Civil, 31 L.P.R.A. sec. 3025. Sobre lo antes dicho puede verse Uria, *Derecho Mercantil,* 2da. ed. (1960) pág. 405; Langle Rubio, obra citada, págs. 11–14 y 163; el mismo autor, *El Contrato de Compraventa Mercantil* (1958) págs. 86–89; Gay de Montellá, *Código de Comercio Español Comentado,* 2da. ed. (1948) págs. 205–206; Benito, *Manual de Derecho Mercantil* (1924) Tomo II, págs. 312–313.

▮ En el caso de autos, no existiendo pacto en contrario son de aplicación los citados artículos del Código de Comercio sobre la compraventa mercantil y concluimos que la obligación del deudor de pagar el interés legal comienza desde el día siguiente al día en que éste recibió las mercancías, Código de Comercio, Arts. 257 y 94, 10 L.P.R.A. secs. 1715 y 1314; cf. *Sucesores de Pérez Hermanos* v. *Sucrs. de Abarca,* 33 D.P.R. 105, 107 (1924).

---

(²) Langle Rubio, obra citada, págs. 11–12. El Art. 61 del Código de Comercio español mencionado en esa cita es idéntico al Art. 92 de nuestro Código de Comercio, 10 L.P.R.A. sec. 1312.

*La sentencia del Tribunal Superior, Sala de San Juan, dictada en este caso en 22 de mayo de 1957 se modificará* para incluir en ella los $26.98 que el demandante pagó al Banco de Ponce por sus gestiones de cobro y para condenar al demandado al pago de los intereses, al 6% anual, de las siguientes partidas, que representan las sumas principales en cada caso, y desde las fechas que a continuación se especifican, las cuales corresponden al día siguiente del día en que el demandado recibió la mercancía:

Partida 1 ($845.41) desde el 29 de febrero de 1950.
Partida 2 ($607.48) desde el 21 de marzo de 1950.
Partida 3 ($607.28) desde el 4 de abril de 1950.
Partida 4 ($265.68) desde el 11 de abril de 1950.
Partida 5 ($283.18) desde el 19 de abril de 1950.

*Así modificada, la mencionada sentencia del Tribunal Superior, se confirmará. Se imponen las costas al demandado por ser mandatorias, Regla 44.4 de las de Procedimiento Civil, Garriga, Jr. v. Tribunal Superior, 88 D.P.R. 245 (1963).*