### GEORGIA–PACIFIC CORPORATION, Plaintiff,

v.

### PABLO EGUÍA & SONS, INC., et al., Defendants.

### Civ. No. 91–1772(PG).

United States District Court, D. Puerto Rico.

May 28, 1993.

---

Néstor Durán and Manuel Fernández–Bared, McConnell Valdés Law Offices, San Juan, P.R., for plaintiff.

Iván Durant–Sierra, Bayamón, P.R., for defendants.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

In this diversity action, the Court must presently determine which statute of limitations applies to certain commercial transactions conducted by the parties to this litigation: the three year one provided by Article 942 of the Commerce Code or the fifteen year one provided by Article 1864 of the Civil Code. The Court must also determine whether a surety agreement executed by the parties applies to the instant dispute. These endeavors must be performed by zealously resorting to Civil Law principles.[1]

1. As we all know by now, a federal diversity court must apply the substantive law of the fo-

## I. *Background*

The undisputed facts prompting this litigation are essentially as follow. Plaintiff, Georgia Pacific ("GP"), a Georgia corporation with its principal place of business therein, is a manufacturer and wholesale distributor of household products throughout the United States. Defendants are four Puerto Rico corporations with their principal places of business in the Island.[2] On September 23, 1981, defendant Pablo Eguía & Sons, Inc. ("Eguía") and GP entered into a contract naming Eguía GP's Puerto Rico representative for the sale of Dovallette brand tissue products. *See* Plaintiff's Exhibit A. On the same date, all defendants executed a guaranty for the full and prompt payment and discharge of all invoices issued by GP pursuant to the Eguía representation contract. *See* Plaintiff's Exhibit B. Paragraph two of the guaranty provides:

The undersigned agree that, whenever such invoices and the obligations represented thereby remain unpaid in whole or in part for more then ninety (90) days, the undersigned, without G–P [Georgia Pacific] first having to proceed against or make demand upon customers of products, will pay upon demand all sums then due or to become due to G–P on such invoices and obligations and any losses, costs, attorney's fees or expenses which may be incurred by G–P as a result of such default by such customers or default by any of the undersigned.

Paragraph three of the guaranty provides: "This Guaranty shall only terminate when the obligations of the undersigned are satisfied. This Guaranty shall not automatically terminate upon termination of the Sales Representation Agreement or the License Agreement referred to therein."

Paragraph five provides:

Notwithstanding the ninety (90) day period referred to in Article 2 hereof, the guaranty obligation of the undersigned and the right of G–P to demand immediate performance of this Guaranty by the undersigned shall accrue and mature immediately in the event any customer or products is adjudged insolvent or bankrupt, or by judicial determination is placed under the control of receivers, or makes a general assignment for the benefit of its creditors or any bankruptcy or insolvency proceeding is commenced with respect to such customer.

The guaranty agreement between the parties expired on November 1987 and was never renewed. *See* Defendants' Exhibit A.

From 1981 to 1989 GP sold bathroom tissue to numerous local retailers via Eguía. *See* Plaintiff's Exhibit C, Defendants' Exhibit B. Defendants, pursuant to the guaranty, presently owe GP at least $213,906.77, amount representing a myriad of unpaid invoices. *See* October 16, 1992 Stipulation (docket # 10). However, they refuse to pay said sum on the ground that the limitations period to bring said action has expired.

On June 17, 1991, GP filed a complaint before this Court seeking payment of the above mentioned sum. The parties have cross moved for partial summary judgment.[3] Since at this juncture no factual controversies exist, the Court may enter summary

rum state as its rule of decision. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In addition, the Supreme Court of Puerto Rico has strenuously stated that Commonwealth courts must always look to Civil Law when resolving Civil Law problems, and that only in the absence of guidance therefrom should a court look to Common Law as persuasive authority. *Valle v. American International Insurance Co.*, 108 D.P.R. 692, 696–97 (1979). *Accord, e.g., Murray v. Ramada Inns, Inc.*, 521 So.2d 1123, 1125 (La.1988). This Court thus follows the mandate of *Erie* and *Valle*. *See, e.g., Chapman v. E.S.J. Towers, Inc.*, 803 F.Supp. 571, 574 n. 5 (D.P.R.1992).

On numerous past occasions, courts in the First Circuit have certified to the Commonwealth

Supreme Court unclear issues of local law which are of potential importance to future litigants. *See, e.g., Sierra–Serpa v. Martínez*, 966 F.2d 1, 4 (1st Cir.1992). This case however, as the text of this opinion shall demonstrate, is not one which warrants the use of such procedure.

2. These corporations are: Pablo Eguía & Sons, Inc., Maite Realty, Inc., Rommel Realty Inc., and Margaux Realty, Inc. The latter three companies are affiliated to the first.

3. An additional $23,086.00 are still in controversy. Said amount is not being presently contested in the instant cross motions for summary judgment, thus the Court shall likewise ignore it at this juncture.

judgment in favor of the party with the applicable law on its side. *See Sheinkopf v. Stone,* 927 F.2d 1259, 1261–62 (1st Cir.1991). The Court's attention thus shall be wholly devoted to answering two legal issues raised in the parties' memoranda:

(i) what is the applicable statute of limitations in this controversy?

(ii) in light of the surety agreement executed by the parties, are defendant's liable for invoices pertaining to Eguía's clients that filed bankruptcies after November 1987?

## II. *Discussion*

### (i) *Applicability of the Commerce Code*

■ As a threshold matter, it is necessary for this Court to determine whether the transactions involving GP and the defendants were mercantile in nature so as to apply the Commerce Code, 10 L.P.R.A.App. I § 1001 *et seq.,* thereto.[4] From the sales representation agreement (Plaintiff's Exhibit A) it appears that the relationship between GP and Eguía was as follows. Eguía would generate orders of GP's products from local buyers. Seventy five percent of the merchandise would then be shipped by GP from the mainland and twenty five percent would be shipped from Eguía's warehouse in Puerto Rico.

GP's products were sold to two types of customers: "direct" or "warehouse." "Direct customers" are those who made purchases in quantities equal to the capacity of a containerized van. These customers were directly invoiced by GP. "Warehouse customers" are those who made purchases of less than van load quantities. These customers were directly invoiced on GP's behalf by Eguía.

Eguía would sell GP's merchandise to retailers at the rates set by GP. *See* Plaintiff's Exhibit C, Defendants' Exhibit B (GP's unpaid invoices). As compensation for its work, GP paid Eguía a 4% commission for the sale of those products shipped from the mainland

and a 4.5% commission for that of those stored in Eguía's warehouse.

\* \* \* \* \* \*

Article 2 of the Commerce Code, 10 L.P.R.A.App. I § 1002, states that "Commercial transactions shall be considered those enumerated in this Code and any of a similar character." We must thus look to the Commerce Code to see if any of the transactions between the parties are enumerated therein.

Article 243 of the Commerce Code, 10 L.P.R.A.App. I § 1701, defines a commercial purchase and sale as follows:

"A purchase and sale of personal property for the purpose of resale, either in the form purchased or in a different form, for the purpose of deriving profit in the resale, shall be considered commercial."

*See Reece Corp. v. Ariela,* 88 J.T.S. 103, 6140. In the case at bar, it is evident that there was not an all-encompassing purchase and sale transaction scheme *between GP and Eguía.* However, purchase and sale transactions abound in the sales from GP (via Eguía) to the retailers since the latter's purpose was to *derive profit* from the *resale* of bathroom tissue. These sales are hence clearly governed by the Commerce Code. Our inquiry however does not come to an end here.

In *Pacheco v. National Western Life Ins. Co.,* 88 J.T.S. 93, 6073, the Commonwealth Supreme Court discussed the novel theory of "actos de comercio por relación.[5]" According to Spanish commentators, certain acts civil in nature become commercial when performed in conjunction with an act of commerce. The Court, applying said theory, concluded that a distribution contract is an act of commerce. Likewise, in the case at bar, the relationship between GP and Eguía is commercial in nature since the representation agreement between these two corporations is umbilically linked to mercantile purchases and sales between GP and local retailers. Hence, it is governed by the Commerce Code.

---

4. Generally, the burden of establishing the applicability of the Commerce Code is on the party contending the governance of said body of law. *Pescadería Rosas, Inc. v. Lozada,* 116 D.P.R. 474, 481 (1985). In the case at bar, neither party disputes the applicability of the Commerce Code to the transactions at issue. Nevertheless, the Court deems it necessary to make this determination independent of the parties' stipulation.

5. Literally, this translates to acts of commerce by their relationship.

(ii) *Test for selecting the applicable statute of limitations*

■ Article 2 of the Commerce Code, 10 L.P.R.A.App. I § 1002, provides:

"Commercial transactions, be they consummated by merchants or not, whether they are specified in this Code or not shall be governed by the provisions contained in the same; in the absence of such provisions, by the commercial customs generally observed in each place; and in the absence of both, by those of the common law [6]."

Our quest now brings us to the issue of whether there is any statute of limitations in the Commerce Code which precludes GP from seeking payment of the products sold via Eguía to retailers. If not, we must then look to the customs of each place or to the Civil Code for guidance.

The defendants cite Article 942 of the Commerce Code, 10 L.P.R.A.App. I § 1904, as being applicable to the present controversy. Said article reads:

"The liability of exchange brokers, commercial brokers, or shipbroking interpreters in the obligations in which they take part by reason of their office shall prescribe after three years."

The plaintiff, on the other hand contends that Eguía is neither an exchange nor commercial broker, nor a shipbroking interpreter so as to trigger Article 942's statute of limitations. Rather, it contends that since none of the prescription articles of the Commerce Code apply, the Court must borrow the most analogous prescription article from the Civil Code. In its opinion, Article 1864, 31 L.P.R.A. § 5294, which provides a term of fifteen years for actions with no fixed term to prescribe, is the appropriate article to apply to the instant controversy.

As far as this Court can tell, no opinion from the Puerto Rico Supreme Court, First Circuit nor judge of this District addresses the applicability of Article 942 of the Commerce Code to any type of commercial trans-

action. Thus, this Court must look to the works of civil law commentators or to judgments from other civil law jurisdictions discussing this article or one of its counterparts in order to determine how the Commonwealth Supreme Court would rule in the present instance.[7]

(iii) *Applicability of Article 942 of the Commerce Code to the transaction at bar*

In order to determine whether Article 942 is of applicability it is necessary to conclude whether Eguía is either (a) a ship broker-interpreter, (b) an exchange broker or (c) a commercial broker within the meaning of the Commerce Code.

\*　　\*　　\*　　\*　　\*　　\*

■ It is evident that Eguía is not a ship broker-interpreter. Article 78 of the Commerce Code, 10 L.P.R.A.App. I § 1241, lists the duties of ship broker-interpreters:

(1) To intervene in charter contracts, marine insurance contracts, and contracts of bottomry, when required to do so.

(2) To aid captains and supercargoes of foreign vessels and to act as their interpreters in making declarations and protests and in transacting such other business as they may have.

(3) To translate such documents as the aforesaid captains and supercargoes may have to present in public offices, provided there is doubt as to the intelligibility of said documents; and to certify that the transactions are well and faithfully made.

Eguía's acts clearly do not fall within any of these tasks.

\*　　\*　　\*　　\*　　\*　　\*

■ Exchange and stock brokers ("corredores de cambio y bolsa") are those individuals who work in commercial exchanges ("bolsas de comercio"). According to Article 67 of the Commerce Code, 10 L.P.R.A.App. I. § 1201, their function is to intervene exclu-

---

6. By "common law" this Article refers to the Civil Code. *Julsrud v. Peche*, 115 D.P.R. 18, 21 (1983).

7. In *Losacco v. F.D. Rich Construction Co.*, 992 F.2d 382, 384, (1st Cir. 1993) the Court stated: "When the highest state court has not issued a

definitive ruling on the precise issue at hand, the federal courts may refer to analogous decisions, considered dicta, scholarly works, or other reliable sources to ascertain how the highest court would rule."

sively in deals and transfers of all kinds of quotable public securities and to intervene, in concurrence with commercial brokers, in all other exchange transactions and contracts.

Civil Law treatises describe commercial exchanges and their functions as follow:

> The stock exchange is the market for chattel securities. Direct assignment of such securities is rare; they are usually traded on the stock exchange and are therefore called stock exchange securities. In this market transactions are effected solely by official brokers and are performed in a certain way. Owing to its organization, the market has a commercial character even when sellers and buyers are not merchants. (Translation ours)

III G. Ripert, *Traité Elementaire de Droit Commercial* 83 (Tipográfica Editora Argentina trans. 2d ed. 1954).

> "a stock exchange is a special kind of market which is distinguished from others by a number of characteristics; it is organized like a medieval guild; it is frequented by merchants; and the objects traded on the stock exchange are not present therein." (Translation ours)

I J. Garrigues, *Curso de Derecho Mercantil* 59 (Imprenta Argentina, Madrid, 7th ed. 1976).

> "Stock exchanges are the places where trading takes place in public securities, as well as in manufacturing and commercial securities issued in the form of stocks and bonds by eligible firms." (Translation ours)

J.M. Martínez Val, *Derecho Mercantil* 299 (Bosch, Barcelona ed. 1979).

Article 44 of the Commerce Code further states that "None but corporations organized exclusively for the purpose in accordance with the law of private corporations may establish commercial exchanges." 10 L.P.R.A.App. I § 1112.

Clearly, thus, the purchase/sale transactions involving GP, Eguía and retailers did not take place via an exchange, nor is Eguía an exchange broker.

*　*　*　*　*　*

Civil Law treatises describe commercial brokers ("corredores de comercio") and their duties as follow:

> [T]hey are intermediary agents who in accordance with the provisions of the Commercial Code attest as notaries whenever asked, to the commercial acts and contracts in which they intervene by virtue of their profession.

> Brokers intervene only when asked to by an interested party. In order to put on the record their acceptance of their customers' orders, brokers adopt procedures established by custom from among the rules which the Commercial Code prescribes for contracts. Their intervention usually entails the bringing together of contracting parties, acting as middlemen in the coordination of transactions and attesting to the closing of deals. (Citations omitted) (Translation ours)

V Nueva Enciclopedia Jurídica 784 (F. Seix ed., Barcelona 1976).

> "These intermediaries *do not usually close the contracts in the parties' names nor warrant compliance with such contracts*, but rather promote deals and participate in them by authenticating them by virtue of the powers deriving from their position." (Translation ours) (Emphasis added)

R. Uría, *Derecho Mercantil* 56 (Marcial Pons, Madrid 16th ed. 1989).

> [Their] duty is to "bring together and advise contracting parties, to act as middlemen in the coordination of transactions, to enforce trading and price regulations and observance of the law, and attest to terms and conditions of transactions, or intervene by attesting to the "existence of the act, contracting parties' identity and standing, and the execution of the contract." (Translation ours)

Martínez Val, *supra* at 313.

One commentator has distinguished the commercial broker's role from that of an agent:

> The intermediary contract is one whereby one person binds him or herself to pay another, called middleman or broker, a reward for pointing out to him or her the opportunity of performing a legal transac-

tion with a third party or for serving as an intermediary in such closing.

... The intermediary contract resembles the agency contract, but differs from it, not only because the latter confers a steady mandate, whereas the broker's is sporadic, but also because the intermediary is a person who attempts to facilitate the closing of a contract, *but without actually being one of the parties as the agent is.* (Translation ours) (Emphasis added)

F. Sánchez–Calero, *Instituciones de Derecho Mercantil* 434 (Revista de Derecho Privado 13th ed. 1988).

According to Article 73 of the Commerce Code, 10 L.P.R.A.App. I § 1221, the obligations of commercial brokers are the following:

(1) To answer at law for the authenticity of the signature of the last assignor *in transactions involving bills of exchange or other endorsable securities;*

(2) To take part in and *certify* contracts of purchase and sale, and to take part in and *certify the delivery of the securities and payment therefor,* provided the interested parties so demand;

(3) To get from the assignor and deliver to the assignee such endorsable bills of exchange or securities as may have been negotiated through him;

(4) To collect from the assignee and deliver to the assignor the value of such bills of exchange or endorsable securities as may have been negotiated. (Emphasis added)

In the Court's opinion, although Eguía acted as an intermediary between GP and retailers, it is not a commercial broker within the meaning of Article 73. Nor does it fall within the description of said occupation's duties as spelled by Civil Law commentators. Rather, it acted as GP's exclusive agent on a commission basis for the sale of bathroom tissue—something clearly not a security!

(iv) *Looking for the applicable Civil Code statute of limitations*

Since Article 942 of the Commerce Code nor any other proviso of said body of law contains an applicable statute of limitations for the transactions between GP and Eguía, we must look to the Civil Code so as to borrow the most appropriate one.[8] *See Mortensen & Lange v. San Juan Mercantile Corporation y Transportación Marítima Hondureña, S.A. de C.U.,* 119 D.P.R. 345, 351 (1987). In turn, if the Civil Code provides no specific statute of limitations for a particular action, the Court must employ its most analogous one. *See Lozada Torres v. Collazo,* 111 D.P.R. 702, 704 (1981).

The Civil Code provides prescriptive terms for various types of actions. *See* Articles 1861–1870, 31 L.P.R.A. §§ 5291–5300. After examining each of these Articles, the Court is of the opinion that the one applicable to the present controversy is Article 1864, 31 L.P.R.A. § 5294. It provides:

"A mortgage action prescribes after twenty (20) years, and *those which are personal and for which no special term of prescription is fixed, after fifteen (15) years.*" (Emphasis added)

A renowned Civil Law treatise convincingly suggests that said article should be applied in the present instance:

"The term of the statute of limitations for commercial actions for which the Commercial Code provides no special term, is not the period set by common-law legislation, but rather that set in general terms by the Civil Code for acts which have no special term." (Citations omitted) (Translation ours)

III Colin–Capitant, *Curso Elemental de Derecho Civil* 319 (Instituto Editorial Reus, Madrid, trans. 2d ed. 1960). A Spanish commentator's view is also in accord therewith:

"The seller's right to payment for a commercial sale has the same statute of limitations term as in Civil law, to wit fifteen years." (Citations omitted) (Translation ours)

---

**8.** Neither party has indicated the existence of any commercial use of the place. This Court thus will assume that none exists.

Sánchez Calero, *Instituciones de Derecho Mercantil, supra* at 448.

The Puerto Rico Supreme Court has applied Article 1864 of the Civil Code to actions for breach of contract. *E.g., Segarra v. Vivaldi,* 55 D.P.R. 160, 162 (1939). It has also applied it to an action for rendition of accounts. *Serrano v. Talavera,* 65 D.P.R. 438, 442 (1945). The Supreme Court of Spain has also applied said article's Spanish counterpart—Article 1964—to an action arising from a mercantile purchase-sale contract:

> according to Article 943 considered in conjunction with Article 50 of the Commercial Code, there being no specific term for the statute of limitations, such term for causes of action derived from a commercial contract pursuant to Article 325 of the Commercial Code—as is the one exercised in the complaint—must be governed by common-law provisions; a personal action without an essential term of limitation is governed by the fifteen-year statute of limitations provided by Article 1964 of the Civil Code. (Translation ours)

Judgment of May 30, 1979, R.A.J. No. 1951.

In the case at bar, GP and the defendants entered into a guaranty agreement which the latter have thus far failed to honor. GP's cause of action can thus be best described as being one for breach of contract. It may also be described as one for payment of GP's accounts receivable.

Although the contractual relationship between GP and Eguía is mercantile in nature (pursuant to the previously discussed doctrine of "actos de comercio por relación"), the Commerce Code does not provide a statute of limitations for breach of a mercantile guaranty agreement. Thus, this Court shall apply the statute of limitations found in Article 1864 of the Civil Code which applies to actions for breach of contract or for rendition of accounts—actions analogous to the legal remedy sought by GP. *Accord* Judgment of May 30, 1979, *supra.*

The initial representation agreement between the parties was entered into in 1981. Since GP has fifteen years to bring the instant cause of action, the prescriptive period has therefore not elapsed. Summary judgment in plaintiff's favor is thus proper in this instance.

(v) *The defendants' liability for invoices of clients who filed bankruptcies*

■ Article 349 of the Commerce Code, 10 L.P.R.A.App. I § 1821, provides:

> "All guaranties the purpose of which is to insure the fulfillment of a commercial contract shall be considered commercial, even though the guarantor is not a merchant."

Article 350, 10 L.P.R.A.App. I § 1822, in turn provides:

> "The commercial guaranty must be reduced to writing, otherwise it shall be null and void."

Finally, Article 352, 10 L.P.R.A.App. I § 1824 provides:

> "In contracts for an indefinite period, if it has been agreed to give the guarantor compensation, the guaranty shall continue in force until, by reason of the complete termination of the principal contract which is secured, the obligations arising therefrom are canceled. . . ."

In the case at bar, it is clear that the guaranty agreement entered into by the parties (plaintiff's Exhibit B) had the purpose of insuring the fulfillment of a commercial contract between GP and Eguía. Hence it is mercantile in nature. It is also valid as it was put into writing.

The language of the guaranty agreement clearly indicates that the parties intended that the same survive until all of Eguía's obligations were fulfilled, even if the representation agreement terminated, and even in the event of any client's bankruptcy. *See* Paragraphs 3, 5 of Guaranty Agreement. Thus, by virtue of Article 352 of the Commerce Code, codefendants are liable for any amounts owed by retail.

(vi) *Defendants' liability for costs, expenses and attorney fees plus interest accrued*

(a) *costs and attorney fees* Pursuant to Paragraph 5 of the guaranty agreement (plaintiff's Exhibit B), the defendants agreed to pay GP costs, expenses and attorney fees incurred in any litigation as a result of seek-

**54**

ing payment of its invoices. Thus, the Court shall award these.

 (b) *interest* Article 257 of the Commerce Code, 10 L.P.R.A.App. I § 1715 provides:

> After the merchandise sold has been placed at the disposal of the purchaser and after the latter has stated his satisfaction, or if the merchandise is judicially deposited in the case foreseen in section 1708 of this title, the obligation of the purchaser to pay the price of the same in cash or at the periods agreed upon with the vendor shall begin.

Article 259, 10 L.P.R.A.App. I § 1717, further provides:

> "Delay in payment for the article purchased shall obligate the purchaser to pay the legal rate of interest on the amount he owes the vendor."

*See Waterman Export Corp. v. Valdejulli*, 88 D.P.R. 499, 506 (1963).

In the case at bar, it is undisputed that orders of Dovallette tissue were placed at the disposal of retailers. Since the defendants, via the guaranty, agreed to pay GP's customers' unpaid due amounts it follows that they in turn are liable for interest accrued. However, since the defendants assumed liability after day ninety of the customers' nonpayment, their interest shall begin to accrue on the day their obligation commenced.

### III. *Conclusion*

In light of the previous discussion, the plaintiff's cross motion for partial summary judgment (docket # 19) is hereby GRANTED and the defendants' motion for partial summary judgment (docket # 14) is hereby DENIED. The defendants shall pay plaintiff the sum of $213,906.77. The Clerk of Court shall enter partial judgment accordingly.

The defendants shall pay plaintiff the costs, expenses and attorney fees incurred in this litigation. For simplicity's sake, plaintiff shall submit a detailed breakdown of each of the above mentioned items.

The defendants shall also pay plaintiff interest on the various amounts due (which add up to $213,906.77) beginning on the 91st day after these became due. Plaintiff shall submit a detailed breakdown of the amounts owed by GP's customers, their due date, the date when the defendants assumed liability (after ninety days of nonpayment), and the interest due as of said date.

**IT IS SO ORDERED.**